IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO HARRIS, ) | |
|     Petitioner, ) | No. C 07-2084 CRB (PR) |
|   vs. ) | ORDER DENYING PETITION |
| T. FELKER, Warden, ) | FOR A WRIT OF HABEAS CORPUS |
|     Respondent. ) | |

      Petitioner Antonio Harris, a state prisoner incarcerated at Kern Valley State Prison in Delano, California, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 claiming that the trial court erred in refusing to sever his trial from that of his co-defendant.

**STATEMENT OF THE CASE**

      A jury in the Superior Court of the State of California in and for the County of Alameda found petitioner and his co-defendant Eric Lockhart guilty of first degree murder with a robbery special circumstance. On December 12, 2003, the trial court sentenced petitioner and Lockhart to life in prison without the possibility of parole.

      On May 10, 2006, the California Court of Appeal, First Appellate District, affirmed the judgment of the trial court. On August 23, 2006, the Supreme Court of California denied review.

      On April 13, 2007, petitioner filed the instant federal petition for a writ of habeas corpus under 28 U.S.C. § 2254. Per order filed on August 29, 2007, the court found that the petition, when liberally construed, stated a cognizable claim under §

2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer on May 27, 2008. Petitioner filed a traverse on August 7, 2008.

## FACTS AND PROCEDURAL BACKGROUND

The California Court of Appeal summarized the facts and procedural background of the case as follows:

> An amended information charged Lockhart and [petitioner] Harris with the murder of Gerald Brown (Cal. Penal Code § 187) and the special circumstance that they committed the murder while engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)). It was further alleged that they were armed with a firearm (§ 12022, subd. (a)(1)), that Harris had three prior felony convictions and a prior prison term (§ 667.5, subd. (b)), and that Lockhart had one prior felony conviction.
>
> A.  MOTION TO SEVER
>
> Lockhart filed a motion to sever his trial from Harris's, or to redact or exclude three statements made by Harris to the police. (See [People v. Aranda, 65 Cal.2d 518 (1963)]) Harris joined in Lockhart's motion, seeking to exclude his own statements. After the prosecutor agreed not to introduce two of Harris's statements that directly implicated Lockhart by name, the trial court concluded that the third of Harris's statements contained no reference to Lockhart or his existence. On this basis, the court ruled that the admission of the statement would not abridge Lockhart's Sixth Amendment rights and denied the severance motion. The court again denied Lockhart's motion to sever when reargued about three weeks later, and the matter proceeded to trial.
>
> B.  PROSECUTION CASE
>
> Brown was found shot to death in his car in front of his Oakland residence just after midnight on May 15, 2000. The prosecution's theory was first degree felony murder: specifically, that Brown was shot while Lockhart and Harris were robbing him.
>
> 1.  Pauline Coleman's Testimony: The Plan to Rob Brown
>
> Over a number of years, Pauline Coleman and Lockhart lived together, had a child, and used drugs including cocaine, powder heroin, and methadone. Lockhart gave Coleman a ring and asked her to marry him, but in 1998, they pawned the ring at Maxferd's Jewelry store to pay bills and buy drugs. Toward the end of 1999, they had an off-and-on relationship, and Lockhart moved out to live with someone else.
>
> Coleman and Lockhart frequently purchased rock cocaine from victim Brown. At times, Brown drove to Coleman's house in a white car to

2

deliver the cocaine, but twice Coleman and Lockhart picked up drugs from Brown at his home at 5555 Bancroft Avenue in Oakland. Coleman paid Brown for the drugs with cash or, as Lockhart discovered by March 2000, with sex. In addition, Coleman introduced Brown to Lakisa Boatley, a friend with whom she used drugs on a regular basis. Boatley became Brown's girlfriend.

On one occasion, Brown fronted Coleman $25 worth of drugs in exchange for a pendant, which he kept as collateral. Coleman could regain the pendant only by paying Brown $50, which they agreed she would do in April 2000. When the money was due, however, Coleman was in jail. When she had not paid by May 1, 2000, Brown increased the debt to $75 and pressured her to pay.

On the afternoon of May 14, 2000, Lockhart called Coleman and said he was coming over to pick up his clothes. Late that evening, he arrived in a burgundy Falcon driven by "Rod" Albritton, Boatley's former boyfriend. Lockhart got his clothes from the house and went back outside with Coleman. Privately, he asked her whether Brown was "still rolling" (selling drugs) and indicated that Brown would be easy to rob and he was thinking of doing so. Lockhart also said he might beat Brown up. Earlier that year as well, Lockhart had told Coleman that Brown would be easy to rob.

Lockhart asked Coleman to telephone Brown and get him out of his apartment so Lockhart could rob him. Coleman proposed that she call Brown about the money she still owed, explaining how she now owed $75. Appearing "pissed," Lockhart claimed the pendent was worth more than she got in drugs and she should not have pawned it, especially since she was already giving Brown sex for drugs. At Lockhart's suggestion, Coleman agreed to call Brown, at a time of Lockhart's choosing, and tell Brown she would meet him at the Vintage Inn with $50 of the $75. Lockhart said he had a gun, and although he did not show it to her, she had seen him with a gun previously. In discussing the robbery plans, Lockhart referred to "me and my partner," gesturing to Albritton in the car. After his conversation with Coleman, Lockhart left with Albritton.

Twenty minutes later, Coleman telephoned Brown to see where he was. During the conversation, Coleman's call-waiting line clicked; she answered the other line and found it was Lockhart, who told her not to tell Brown to meet yet. She complied. About two hours later, Coleman received another call from Lockhart, instructing her to set up the meeting with Brown. Ten minutes later, Lockhart called again and, finding that Coleman had not yet telephoned Brown, became irritated and directed her to do so.

Coleman called Brown at his house. Boatley answered the phone, and Coleman asked to speak to Brown. Coleman told him she had $50 of the $75 and could meet him at the Vintage Inn. He agreed to meet her in five minutes.

3

About thirty minutes later, Coleman received a call from Brown at the Vintage Inn, asking where she was. Coleman claimed the person who was supposed to bring her the $50 had not arrived. They did not speak again.

2. <u>Enzore Savage's Testimony: Observation of Lockhart and Harris</u>

Enzore Savage, maintaining that he was testifying against his will and that he feared Lockhart and Lockhart's brother, Michael, recounted his observations the night of May 14. Hearing voices outside his apartment near 5555 Bancroft Avenue, he went outside and saw two men sitting at the side of the building. Savage asked what was going on, and one of the men replied they were not doing anything. Savage returned to his apartment. At trial, he stated that the two men were Harris and Lockhart.

An hour or so later, Savage heard a sound like "rapping" on a steel door. He looked out his bedroom window and saw Harris standing at the passenger side of a light-colored Lincoln (which, it was later determined, belonged to Brown). Lockhart was standing about 20 yards away from Harris. A blue Cadillac was parked nearby. Lockhart said to Harris, "Come on, let's get the fuck out of here." Harris walked away. The car door of the Lincoln was left open.

On the night of the shooting, Savage gave police a physical description of the two men but did not say he recognized them. In a May 22, 2000 lineup, he identified Harris as the person standing closest to the victim's car. In a later lineup, Savage recognized Lockhart but did not tell police, indicating instead that two others in the lineup might have been one of the perpetrators. At the preliminary hearing, consistent with his trial testimony, Savage admitted that he had known Lockhart for 15 years and recognized him as one of the perpetrators, but placed Harris as the one closest to Brown's car.

3. <u>Frankie Lee Bonner: Gunshots and Harris's Blue Cadillac Near Brown's Car</u>

At about 11:05 p.m. on May 14, Frankie Lee Bonner saw from her apartment at 5555 Bancroft Avenue a blue Cadillac "that didn't belong on the block" drive by. Around midnight, she heard six to eight gunshots. Looking out her window, she called the police and observed the same blue Cadillac return, pull next to a white car, and then speed away. The door to the white car was open, and a leg was hanging out. There were (bullet) holes in the car windows and door.

4. <u>Officer Thurston and the Contents of Brown's Car</u>

At approximately midnight, Oakland Police Officer D'vour Thurston was dispatched to 5555 Bancroft regarding a possible shooting. Inside the white Lincoln, the officer observed a man, later identified as Brown, on his stomach across the passenger seat. He had been shot several times.

4

Brown's leather coat, wallet, and briefcase were visible inside the car. Brown had $21 in cash in the front pocket of his shirt. Drugs and a nylon bag, containing more money, were also found in the car.

5.    Officer Medeiros's Testimony: Police Investigation

Oakland Police Sergeant Brian Medeiros arrived at the scene at 1:15 a.m. on May 15. He determined that Brown, Boatley, and Carnell Melton lived together in the apartment complex at 5555 Bancroft Avenue, where Brown's Lincoln was parked.

The police walked across the street to Savage's apartment and interviewed him. Savage's subsequent written statement, which was read to the jury at trial, gave an account consistent with his trial testimony. Medeiros confirmed that Brown's white Lincoln was observable from Savage's bedroom window in a well-lit area.

At the scene, Boatley advised police that Coleman had telephoned Brown just before he left his apartment. In a search of Brown's room, police found Coleman's name, phone numbers, and address.

Sergeant Medeiros and Sergeant Lou Cruz interviewed Coleman later that day at the police station. Initially, Coleman admitted making the telephone call to Brown but denied any involvement in a robbery. She claimed a friend named Seth agreed to give her $50 to pay Brown for the narcotics he fronted. She called Brown and told him to meet at the Vintage Inn, but Seth "stood her up." After Sergeant Medeiros accused Coleman of lying and withholding information, she admitted that Lockhart had asked her to tell Brown she would meet him at the Vintage Inn, but she denied her role was to get Brown out of his apartment. Eventually, Coleman admitted that Lockhart told her to call Brown as a means of luring him out of his apartment in order to rob Brown, adding that Lockhart first talked about robbing Brown when he found out Coleman had been sleeping with him. As Sergeants Medeiros and Cruz drove Coleman home, she stated that Lockhart had asked if she wanted to be there for the robbery, but she had declined.

6.    Further Testimony From Coleman: Lockhart's Admission

On May 16, after Coleman had been questioned by police, she received a telephone call from Lockhart. When she said she did not want to speak with him, Lockhart said he was sorry and "it wasn't supposed to happen like that." He claimed the gun jammed and "went off." When Coleman warned Lockhart that the police were looking for him, Lockhart responded: "They don't know it's me." Coleman replied, "They do."

7.    Harris's Cadillac Located

On May 18, 2000, Sergeant Medeiros contacted and interviewed Albritton, who described Harris's vehicle and claimed it was located at an address on 32nd Street in Oakland. The next morning, Sergeant Medeiros went to the location and observed a 1981 light blue Cadillac,

5

matching the description of the car seen at the time of the murder. Sergeant Medeiros confirmed that the Cadillac was registered to Harris.

8. Harris's Statement to Police

On May 19, Sergeant Medeiros and another officer interviewed Harris. In a taped interview played for the jury, Harris stated that around 11:30 p.m. on Sunday (May 14), he drove to 55th and Bancroft, knowing a robbery was going to be committed and expecting to receive $150 to $200. Shortly after arriving, he heard gunshots and drove away.

9. Lineups of Harris and Lockhart and Savage's Identification

In a physical lineup on May 22, 2000, Savage identified Harris as the man who stood by the passenger door of Brown's white Lincoln.

Lockhart was arrested the next day. In a six person lineup including Lockhart, Savage indicated two of the people might have been one of the perpetrators; neither of them was Lockhart. Three weeks later, however, Savage called Sergeant Medeiros, stated he remembered Lockhart, asked if Lockhart was in position number one in the lineup (Lockhart was actually number three), and claimed he was afraid of Lockhart's older brother Michael.

10. Joshua Litz's Testimony: Harris Pawned Brown's Jewelry

Joshua Litz, the manager of Maxferd's Jewelry, testified that on May 15, 2000, at 12:44 p.m.-about 12 hours after Brown's death-Harris produced a California's drivers license and thumb print for identification and pawned four pieces of jewelry. Coleman, Boatley, and Melton identified the jewelry as Brown's. The police crime laboratory concluded that fingerprints on the Maxferd's pawn slips belonged to Harris. According to Maxferd's records, Lockhart and Coleman had previously done business there as well.

11. Autopsy and Bullets

An autopsy determined that Brown had sustained two gunshot wounds to the upper left chest and one to the back of the left forearm and that multiple bullet wounds were the cause of his death. Four cartridge cases found in Brown's Lincoln were .380 auto caliber and had been discharged from the same firearm. Two bullets, one recovered from Brown's body, were also .380 auto caliber and fired from the same gun. The gun was not recovered.

12. Intimidation of Witness Boatley

On July 17, 2000, Alameda County Sheriff Deputy Wellington Wong was dispatched to a San Leandro residence and spoke to Tonisha (a relative of Boatley), who showed him a possum, human feces, and a note that were left at her front door. The note read: "Keysa, snitch ass bith [*sic*]." Tonisha stated that Keysa (Boatley) had been staying there after Brown's murder.

6

> At trial, Boatley asserted that she was afraid to testify because of the note. She acknowledged that Lockhart had not threatened her directly.
>
> 13. <u>Efforts to Secure Savage's Testimony</u>
>
> On September 23, 2003, investigator Clint Ojala served an arrest warrant on Savage to secure his availability for trial. Savage became very upset and stated he was not going to court. Further, he claimed, since Lockhart's brother Michael had been released from prison, he had received threats at his house and was afraid for his family if he testified. Savage was sure that if he testified he or his family would be killed.
>
> C. APPELLANT LOCKHART'S CASE
>
> Lockhart did not testify. He called as a witness Oakland Police Officer Deandrea Vantree, who described her interview of Boatley on May 15, 2000. In the interview, Boatley claimed the shooting occurred between 12:30 and 12:45 a.m., and did not mention Coleman's name or that Brown had received any telephone calls that evening.
>
> Oakland Police Officer Christopher Bolton testified that he spoke to Melton on May 15, and Melton did not say whether Brown had indicated he was going out that evening. In her statement to police, Melton said she was not awakened by any disturbances that night.
>
> Lockhart also introduced several witnesses who vouched for his reputation for honesty and nonviolence. In addition, it was stipulated that Lockhart was convicted in 1990 for the felony sale of narcotics (Health & Saf. Code, § 11352).
>
> C. APPELLANT HARRIS'S CASE
>
> Harris did not testify. His defense theory was that he did not know Brown, and although he admitted to police that he drove Lockhart to the scene knowing a robbery was going to occur, he was not the shooter and did not know Lockhart was armed.
>
> Harris called Inspector Peter Carlson as a witness. In August 2000, Carlson recounted, he and a deputy district attorney interviewed Coleman, who claimed she did not know whether Lockhart owned a gun but had seen him with someone else's gun in the past.

People v. Lockhart, No. A105200, 2006 WL 1280643, **1-6 (Cal. Ct. App. May 10, 2006) (footnotes omitted).

7

**DISCUSSION**

A.     Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark, 331 F.3d at 1069.

      B.      Claim & Analysis

Petitioner's sole claim for relief is that he was denied due process of law under the Fifth Amendment and his right to present a defense under the Sixth Amendment as a result of the trial court's refusal to sever his trial from co-defendant Lockhart's trial. Specifically, petitioner argues that the trial court's failure to sever the trial precluded him from presenting evidence – two of three pretrial statements petitioner made to the police – that would have supplied a defense to the robbery special circumstance. Petitioner also argues that he was prejudiced because the denial of the severance motion and the exclusion of his pretrial statements caused him and Lockhart to present mutually antagonistic defenses.

      1.      Preclusion of Pretrial Statements

Petitioner argues that because he and Lockhart were tried together, Aranda/Bruton[1] precluded him from presenting two of his pretrial statements to police that would have been available to him in a separate trial. Petitioner maintains these statements show he was merely present at the robbery, did not plan the robbery, was not the shooter, did not know Lockhart was armed, and witnessed Lockhart shoot Brown. Taken together, petitioner believes these two statements showed he was not guilty of

---

[1] People v. Aranda, 65 Cal. 2d 518 (1963), and Bruton v. United States, 391 U.S. 123 (1968), hold that introduction of an incriminating extrajudicial statement by a non-testifying co-defendant violates the defendant's right to cross-examination.

9

the charged robbery special circumstance (i.e., that as an aider and abettor to the robbery, he did not act with reckless indifference to human life and as a major participant).

The Sixth Amendment affords an accused in a criminal trial the right to present a defense. Chambers v. Mississippi, 410 U.S. 284, 294 (1973). And the Due Process Clause "requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate the Sixth Amendment right to present a defense, as well as the due process right to a fair trial. DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers, 410 U.S. at 294, and Washington v. Texas, 388 U.S. 14, 18-19 (1967)).

With respect to motions to sever, the Supreme Court has noted that there is a judicial preference for joint trials of defendants who are indicted together because joint trials promote efficiency and avoid "the scandal and inequity of inconsistent verdicts." Zafiro v. United States, 506 U.S. 534, 537 (1993). A judge should grant a severance only if there is a "serious risk that a joint trial would compromise a specific right of one of the defendants or prevent a jury from making a reliable judgment about guilt or innocence." Id. at 539. Such a risk might occur if "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Id.

To prevail on this type of habeas claim in federal court, the petitioner must demonstrate that the state court's denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair in violation of due process. Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1986). In addition, the petitioner must show

that the failure to sever had a substantial and injurious effect or influence on determining the jury's verdict. Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000) (citing Brecht v. Abrahmson, 507 U.S. 619, 637 (1993)).

In the instant case, the California Court of Appeal gave a reasoned opinion concluding that petitioner's rights to due process and to present a defense were not violated by the trial court's denial of the severance motion and exclusion of petitioner's pretrial statements. See Lockhart, 2006 WL 1280643, at **9-13.

On May 19, 2000, Sergeants Medeiros and Cruz conducted three taped interviews of petitioner. The trial court excluded the first two interviews because they implicated Lockhart by name and could have violated his Fifth and Sixth Amendment rights. The California Court of Appeal summarized the interviews as follows:

> In the first interview, which took place between approximately 5:30 p.m. and 6:05 p.m., Harris did not tell police that he knew of Lockhart's robbery plan when he drove Lockhart to the scene. According to this first account, Harris was at home around 8:00 p.m. on Sunday (May 14) when Lockhart came by with a bag of clothes, claiming he had a fight with his girlfriend and needed a ride to his sister's house. Harris drove Lockhart to his sister's house where he dropped off his clothes, and then to a liquor store where they bought gin and beer. After visiting friends for about an hour or so, Lockhart directed Harris to 55th and Bancroft in Oakland, where there was a white car. Lockhart told Harris to wait while he spoke to a man sitting in the driver's seat of the white car. Lockhart went over to the white car and sat in the passenger seat. About 30 seconds later, Harris heard two or three gunshots and saw the driver slump over. Lockhart ran back to Harris's car with a small silver gun in one hand and a fist full of money in the other. Harris asked what Lockhart was doing, and Lockhart replied that he needed money badly. Harris protested that there were other means of getting money and he did not "want to be a part of this." Harris then drove Lockhart back to his sister's house. Also in this interview, Harris told police that he neither had a gun nor shot anyone that night, and claimed that everything he told the police on tape was the "[o]ne hundred percent" truth.
>
> Harris's second taped interview began at 8:36 p.m. and ended at 9:16 p.m. This time he admitted that he drove Lockhart to the scene of the robbery knowing that Lockhart had a plan to commit a robbery. When they left Lockhart's sister's house on Sunday night, Harris recalled, Lockhart said he was doing badly and needed help. He offered to give Harris "a little change"-perhaps $150 to $200-for giving him a ride. Lockhart explained that he was meeting a guy he had dealt with on

11

> several occasions and was going to rob him of drugs and money. Lockhart promised nothing serious would happen, and that he was just going to take the "little punk['s]" "stuff." According to Lockhart, the victim would probably have two or three thousand dollars. The victim was not there, however, when Lockhart and Harris arrived at 55th and Bancroft, so they waited for about 10 or 15 minutes, drinking gin and beer. A man (Savage) approached, and they claimed they were not doing anything. Harris then drove Lockhart to a phone booth; Lockhart made a telephone call, and Harris drove him back to 55th and Bancroft. The victim (Brown) drove up in his white car; Lockhart got in; they talked, and soon after, Harris heard gunshots. Harris jumped out of his own car and asked, "What the hell is going on?" as well as "Let's go." Lockhart got into Harris's car, holding an automatic pistol and some bills. Lockhart told Harris that he "snapped and went off" and "popped the dude." Harris then drove Lockhart to his sister's house. Also in this interview, Harris claimed that, while he knew Lockhart was going to rob Brown, he had no idea Lockhart was going to kill him and did not know that Lockhart had a gun. Once again he claimed that everything he told the police was the "[o]ne hundred percent" truth.
>
> Harris's third taped statement to police-the one played to the jury at trial-was recorded at 11:32 p.m. and ended at 11:35 p.m. According to Sergeant Medeiros, the intent was to delete any reference to Lockhart in this statement and avoid problems under <u>Aranda-Bruton</u>. In pertinent part, the interview proceeded as follows: "[SERGEANT MEDEIROS]: Okay. We're just going to ask you a couple of questions. All we want is yes-or-no answers, okay? All we want is just yes or no for the tape, okay? The first question would be-and this is going back to Sunday night-(unintelligible)-about what time was it, just so I can ask the question? [¶] [HARRIS]: I believe about 11:30 or something. [¶] [SERGEANT MEDEIROS]: 11:30? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: On this past Sunday night at 11:30 p.m., you drove to the area of 55th and Bancroft, knowing a robbery was going to be committed, in which you had the expectation of receiving 150 to $200 cash? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: Shortly after arriving, you heard gunshots? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: Immediately after the shots, you drove away, correct? [¶] [HARRIS]: Yeah. [¶] SERGEANT MEDEIROS: Sergeant Cruz, any questions? [¶] SERGEANT CRUZ: I don't have anything. [¶] [SERGEANT MEDEIROS]: Is that the truth? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: Okay." Thus, just as in the second statement, Harris admitted that he drove to the scene knowing there was going to be a robbery and heard gunshots, but this time did not refer to any accomplice expressly or Lockhart at all.

<u>Lockhart</u>, 2006 WL 1280643, at *6-7.

Petitioner maintains the first two statements should have been admitted under California Evidence Code section 356, which provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the

same subject may be inquired into by an adverse party; . . . when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

      The California Court of Appeal found that the petitioner's first statement would not have been admissible in a separate trial because this statement was not part of the same conversation as the third statement and does not aid in the understanding of the third statement. Lockhart, 2006 WL 1280643, at *11. The court also found that the first statement contradicts the third statement because the first statement implies petitioner did not know he was driving to a robbery, whereas the third statement explicitly states he drove to the scene knowing a robbery was going to take place. Id.

      In contrast, the court found that petitioner's second statement likely would have been admissible in a separate trial under California Evidence Code section 356 to clarify the third statement. Id. The second statement clarified that petitioner was to receive money specifically for giving Lockhart a ride to the scene, and included additional details including: (1) Harris's response to the gunshots (he jumped out of the car and yelled, "What the hell is going on?" and "Let's go."); (2) Lockhart returned to the car, holding a gun and money; (3) Lockhart explained how he "snapped" and "popped the dude"; and (4) Harris then drove the two of them from the scene. Id.

      The court nonetheless determined that the omission of the second statement did not prejudice petitioner with respect to the robbery special circumstance, which requires that the defendant assist in the robbery with reckless indifference to human life and as a major participant. Id. at *11-12; see Cal. Penal Code § 190.2(d). The court found that both the second and third statements showed petitioner acted with reckless indifference and as a major participant because both statements showed petitioner drove to the robbery, knew a robbery was going to take place, expected to be paid, heard gunshots,

and drove away. Lockhart, 2006 WL 1280643, at *12. In fact, the court found the second statement may have been "more damning" for petitioner because it shows that he did not just drive to the scene, hear gunshots and leave (as the third statement indicates), but rather that he was the one who transported the actual shooter to the scene and then took him to a place of safety after the murder had been committed. Id.

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involve an unreasonable application of, controlling federal law. See 28 U.S.C. § 2254(d). Nor was it based on an unreasonable determination of the facts. See id. Denial of severance resulting in the exclusion of essential exculpatory evidence can deny a defendant's rights to present a defense and to due process, but that was not the case here. Petitioner's two excluded pretrial statements did not amount to "essential exculpatory evidence" such that their exclusion resulted in prejudice great enough to render petitioner's trial fundamentally unfair, see Grisby,130 F.3d at 370, and did not have a substantial and injurious effect or influence on determining the jury's verdict, see Sandoval, 241 F.3d at 772.

As the California Court of Appeal noted, petitioner's first two pretrial statements fail to clarify the third statement in a way that would provide petitioner with a defense to the robbery special circumstance. In fact, these statements either contradict the third statement or provide details that would be more harmful to petitioner's special circumstance defense.

In the first statement, petitioner maintains he did not know he was driving Lockhart to a robbery. This is contradicted by both the second and third statements where petitioner admits he knew he was driving to a robbery and that he expected to be paid for driving. The first statement also specifies petitioner drove Lockhart, the actual shooter, to and from the murder, while the third statement just says petitioner drove himself to and from the murder scene. Also, the first statement says petitioner heard

14

gunshots, saw Brown slump over, then drove Lockhart away from the scene leaving Brown to die in his car, while the third statement just says petitioner heard gunshots then drove away. These clarifications in the first statement simply highlight that petitioner acted with reckless indifference to human life by driving away from the scene knowing Brown had been shot and was a major participant in the robbery by driving Lockhart to and from the scene in exchange for money.

In the second statement, petitioner states he knew he was driving to a robbery and expected payment for driving. Like the first statement, the second statement again specifies petitioner drove Lockhart, the actual shooter, to and from the murder. The second statement also shows Lockhart told petitioner he had "popped" Brown, then petitioner left the scene knowing that Brown had been shot. Again, this statement shows petitioner acted with reckless indifference to human life and as a major participant.

The second statement does state that petitioner did not know Lockhart had a gun, a detail missing in the third statement. The California Court of Appeal reconciled this fact by finding that although the second statement explicitly states petitioner had no knowledge of the gun, nothing in the third statement implies that petitioner did know Lockhart had a gun. This determination was not objectively unreasonable. See 28 U.S.C. § 2254(d). Absent an inference that petitioner knew Lockhart had a gun, the exclusion of the second statement cannot be said to have had a substantial and injurious effect or influence in determining the jury's verdict. See Sandoval, 241 F.3d at 772. Moreover, even if the second statement showed petitioner did not act recklessly with respect to the gun, he knowingly drove Lockhart to a robbery, a crime that certainly could result in injury, and then drove Lockhart from the murder scene knowing Brown had been shot and leaving him to die in his car, which shows petitioner still acted with reckless indifference to human life.

15

        The court is satisfied that the two excluded statements fail to provide petitioner with a defense to the robbery special circumstance or rise to the level of "essential exculpatory evidence." Grisby, 130 F.3d at 370. Their exclusion neither resulted in prejudice great enough to render petitioner's trial fundamentally unfair nor had a substantial and injurious effect or influence in determining the jury's verdict. Petitioner is not entitled to federal habeas relief on this claim. See 28 U.S.C. § 2254(d).

        2.        <u>Mutually Antagonistic Defenses</u>

        Petitioner claims the trial court's denial of the severance motion caused him and Lockhart to assert conflicting defenses at trial. Petitioner argues that while Lockhart wanted petitioner's first two pretrial statements excluded because they implicated Lockhart in the charged offense, petitioner wanted the two statements admitted because they could provide him with a defense to the robbery special circumstance.

        Mutually antagonistic defenses are not prejudicial <u>per se</u>, but in some circumstances mutually antagonistic defenses may be so prejudicial as to mandate severance. Zafiro v. United States, 506 U.S. 534, 538 (1993). Severance should be granted where a defendant shows "the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by the jury precludes the acquittal of the defendant." United States v. Throckmorten, 87 F.3d 1069, 1072 (9th Cir. 1996). But "antagonism between defenses is insufficient; the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive." United States v. Sherlock, 962 F.2d 1349, 1363 (9th Cir. 1992). Also, "the mere presence of hostility among defendants or [one defendant's] desire to exculpate himself by inculpating the other does not generate the kind of prejudice that mandates severance." Id.

        In the instant case, the California Court of Appeal rejected petitioner's claim that the denial of severance caused him and Lockhart to assert conflicting defenses. See

16

Lockhart, 2006 WL 1280643, at *13.  The court noted that in order to obtain relief, petitioner must show that the joint trial "created a conflict so prejudicial that the jury unjustifiably concluded that the defendants were guilty based on the conflict alone."  Id. (citing People v. Coffman, 34 Cal.4th 1, 42 (2004); People v. Hardy, 2 Cal.4th 86, 168 (1992)).  The court found that the conflict asserted by petitioner failed this test because "it was not even known to the jury, let alone so prejudicial that it alone would have led the jury to conclude that both Lockhart and Harris were guilty."  Id.

       The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involve an unreasonable application of, controlling federal law.  See 28 U.S.C. § 2254(d).  Nor was it based on an unreasonable determination of the facts.  See id.  Although mutually antagonistic defenses may be so prejudicial as to mandate severance,  this was not such a case.  See Zafiro, 506 U.S. at 538.  Petitioner and Lockhart presented antagonistic defenses, but acceptance of Lockhart's defense (and the resultant exclusion of petitioner's pretrial statements) did not preclude the jury from acquitting petitioner.  See Throckmorten, 87 F.3d at 1072.

       First, as discussed earlier, petitioner's first two pretrial statements would not have provided a defense to the robbery special circumstance.  In fact, these statements clarify the third statement to the detriment of petitioner by supplying additional facts that show he acted with reckless indifference to human life and as a major participant in the robbery.  The first two statements specify petitioner drove Lockhart, the actual shooter, to and from the murder, while the third statement just says petitioner drove himself to and from the murder scene.  The first two statements also show petitioner drove Lockhart away from the murder scene knowing Brown had been shot, while the third statement just says petitioner heard gunshots then drove away.  Because the first two statements would have been more harmful to petitioner's case than the admission of

the third statement alone, their exclusion did not preclude the jury from acquitting petitioner. See Throckmorten, 87 F.3d at 1072.

Second, even if the first two statements could have helped petitioner's case, the evidence of petitioner's guilt outside of his pretrial statements is so strong that it eliminates any risk of prejudice that excluding the statements might have caused. Enzore Savage testified that on the night of the murder he heard "rapping" noises outside of his apartment and then saw petitioner and Lockhart standing at the passenger side of Brown's car. Savage subsequently identified petitioner in a police lineup. In addition, petitioner's Cadillac matched the description of the car Frankie Lee Bonner saw from her apartment on the night of the murder. She heard gunshots and observed a blue Cadillac pull next to Brown's car and then speed away. She also said there were bullet holes in Brown's car and a leg hanging out of the door. Moreover, Joshua Litz testified that 12 hours after Brown's death petitioner pawned Brown's jewelry. Petitioner also produced a California's drivers license and thumb print to the pawn shop for identification.

This evidence shows petitioner acted with reckless indifference to human life by speeding away from the scene of the murder after shots were fired. It also shows petitioner was a major participant in the robbery that resulted in Brown's death because he was present when the robbery took place, sped away from the scene, and was in possession of Brown's jewelry after the murder. In view of this substantial evidence of guilt, it cannot be said that the exclusion of the first two pretrial statements had a substantial and injurious effect or influence on the verdict. See Brecht v. Abrahmson, 507 U.S. 619, 637 (1993). Petitioner is not entitled to federal habeas relief on this claim. See 28 U.S.C. § 2254(d).

**CONCLUSION**

After a careful review of the record and pertinent law, the court is satisfied that the petition for a writ of habeas corpus must be DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: November 24, 2008

CHARLES R. BREYER
United States District Judge